You may proceed. Thank you, Your Honor. May it please the Court, Ted Frank for the Object to Repellence, I'd like to reserve eight minutes for rebuttal. This is a settlement that pays $19 million to the attorneys and gives nothing to the class that they would not get if they opted out. $42 million or so of SIPRE is in large chunks going to organizations that many and perhaps a majority of class members would oppose, including for projects that many or a majority of class members would oppose. And it's being administered over the course of several years by an Article III judge acting as a grant administrator. Now, many of the strongest arguments against that are indeed foreclosed by Ninth Circuit precedent, but the Ninth Circuit has not reached, I think, three major issues here. One, the effect of Rule 23E2C2 on a monetary fund and whether a monetary fund that can be distributed as I think the empirical evidence that's undisputed demonstrates at 2ER77-80. Two, whether controversial beneficiaries of SIPRE are appropriate when many class members or even a majority of class members would oppose what these organizations are doing and indeed propose to do with the money, including in some cases explicitly violate the law against racial discrimination. For example, the Rose Foundation application at 3ER-356. And then third, whether it's appropriate for, given the possible conflicts of interest for the district court to act as a grant administrator over the course of several years. So, I want to go back, I guess, to your first issue and the court's approval of this in the first instance. As I read the district court's order, it seems like a premise of the decision is that it's not appropriate to consider feasibility for less than the entire class population, that you have to analyze that question, both sort of the payout amount and the feasibility of it, as though you were going to administer this settlement to every single member of the class. Do you agree that that was a premise of the district court's decision? Yes, I do. Can you tell me, at least on page 18 of the district court's order where it seems to be talking about the feasibility side more, it cites Lane for the idea that you can't assess feasibility based on administering to less than all of the class, and it cites Lane for that proposition. I'm curious what your reaction to that is. I don't see Lane as talking about that issue at all. Lane doesn't talk about that. The parties in Lane conceded that it was not feasible to distribute the money, and they were just complaining about the conflicts of interest. But did you present evidence to the district court about the feasibility of paying out a settlement amount to something less than the full class population? Absolutely. We identified dozens of settlements, and again, those are listed at 2 ER 76 through 80, including a Google settlement for a class just as large of a substantially smaller sum, $23 million. That was the Google refer case that went up to the Supreme Court, went back down on remand rather than try to do cypre. They said, okay, we'll give the money to the class, and they were able to distribute $7.70 checks to the 1.5% of the class that made claims. Even though it was not $0.23 a class member, it was $0.11 a class member in the $23 million settlement fund. But we also identified dozens of other settlements. The complaint that the settlement administration costs might be 2 to 12% of the entire settlement fund. Well, we identified settlements that were successfully distributed where settlement administration costs were 20% of the settlement fund. Much smaller amounts have been distributed to much larger, to classes of the same or similar size. Absolutely, you have most class actions distribute to a tiny fraction of the class because the median claims rate is under a percent. And it only goes substantially higher than that when it's a relatively small compact class that's getting direct notice for a very large sum. So when you have a Facebook settlement for a particular group of people, and you're giving them direct notice that they can get $600 if they make a claim, you get a 22% claims rate. When you have this sort of thing where there isn't direct notice and there's just generalized internet advertisements and whatever press coverage there is, you get a claims rate of under a percent or maybe a percent and a half. In Google Refer, you got a percent and a half, and that was just through direct notice through email. But all of that is in the record and none of that got considered by the district court. The only thing it considered was the declaration saying, well, it will cost $1 million, $7 million to do the distribution, and therefore it's too difficult. But that's every class action, and we demonstrated that. Why doesn't Google Street View control here in terms of feasibility? In Google Street View, the only way you could identify a class member, or at least the premise of the Ninth Circuit opinion was you could not identify class members without several years of forensic examination. And class members could not self-identify. But they didn't know, they couldn't self-identify because they didn't know when the car was going by their house or what their situation was, right?  In Google Street View, it was a Google car going by, and by the way, we're going to collect your Wi-Fi information as you're going by, and nobody knew if their Wi-Fi was on, if the car was going by. So you think they can self-identify here? What would that look like in terms of, what are they going to have to demonstrate to show that they're a member of the class? It looks like every other settlement that gets approved in this circuit, the class member goes forward and says, you know, I purchased ConAgra oil, or I had my Google, my location history turned off on my iPhone or on my Android, and in this time frame. How would somebody know that? Well, you make a, that's a conscious decision whether to have your location history on or  Certainly, the representative class members knew that, and nobody contested that they were class members. So I was trying to figure out, like, what's the burden of proof, like, what would they, how would this get administered, right? So I assume that they're going to file a declaration and say, I did this, you know, I turned this off during the relevant period, so I'm a member of the class. You just take that as face value? You could audit if you have reason to believe that there's fraud, but the reason we don't have an ascertainability requirement, and this is the first Briseño opinion, is because we trust class members under penalty of perjury to say, I'm not committing perjury for $7. And right now, the notice just went out for an Apple settlement, which is almost the exact same privacy violation that Siri was collecting voice information when people thought that they had Siri turned off. And again, that's just going to be a class member attesting that I had Siri turned off, but Siri heard my class, so Siri turned on when I thought I was off. And that's going to allow them to make a claim. We allow people to make claims on the, right? Nobody saves their receipt for Wesson Oil, but you can make a claim for it. Nobody saves what their settings were. They will just attest it under penalty of perjury. I turned off location services, and during this time, Google was collecting information from everybody, not just the people who kept location services on. So I'm going to come back to a question I was asking before. I asked you about evidence of what's in the record in terms of the likely claim rate on a class population like this. The pages that you gave me are about class size and approval of very large class sizes, but I don't think it gets to the question I'm asking, which is, what information does the district court have to know that in a class like this that's going to be administered with sort of public notice, as you indicated, that you're only going to get a very low claim rate? Certainly. We cited the Carrier IQ case, which cited empirical studies about this. That's in our brief, and I can get you the direct site for that. And the Google Referrer case, which was in front of the very same district court judge with the very same size class, with the very same defendant, had a 1.5% claims rate. And that was with direct notice. By direct notice, you mean a mailed card? An email. An email? Yes, sir. Okay. And so you think that the 247 million people here could be contacted by email? I don't know if that's in the plans. I don't remember if they were contacted by email the first time around. I don't think they were, given what the administrative costs were. But I could be corrected on that if I'm wrong, if they've already been connected by email. But that would just mean that the claims rate's going to be even lower. Because we wouldn't be able to get notice to many people in the class. The notice would be through some sort of internet advertising, which does result in lower claims rates. And that's what Carrier IQ stands for, or the evidence cited in Carrier IQ. Pearson versus NBTY in the Seventh Circuit cites similar empirical studies. That's 772F3rd778. I mean, this is just a background question, just to figure out the scope of a district court's discretion here. In a case like this, where the damages to the class are unliquidated, in the sense of like, it's not like you paid, you were unfairly charged a fee that is known. It's an unliquidated amount. Can the district court say, we're going to go through a claims process and see what kind of a return we get in terms of how many people seek their amount for the settlement, and then figure out how much to pay them? Certainly, the district court could say, we're going to go through the claims process, and if it turns out we have a 37% claims rate and everybody's going to get 37 cents, then it's not feasible to distribute. Though, I think even then, in 2025, with modern electronic cash technology, that's not true anymore. But I'm happy to take the risk that- Well, I guess, let me ask it a different way. So here, the presumption is it's 25 cents if every class member were to make a claim. So you go through the claims process and you get 3% of people making a claim or whatever. Could, at that point, the district court, after considering the administrative costs or whatever, say, we're giving everybody $2? Well, at a 3% claims rate, it would be about $7 or $6 or $5 after the attorney's fees. But then you're asking the court to spend the administrative costs of claim intake, which is the reason why the court didn't want to do it in the first place. Could I interrupt for a second? Were you sharing time with co-counsel? No. No?  There was- the state AGs filed amicus and asked for argument time, and that was denied. I'll reserve the rest of my time for rebuttal, unless the court has something- Do you have a question? No. Okay, thank you. Thank you, Your Honor. Okay, you can proceed. Good morning, Your Honor. Samuel Issacharoff for the appellee class below. I think that the place to start is, what is this court's standard of review? What should this court be reviewing at this point? The heart of Mr. Frank's argument is that the normal discretion afforded to the district court does not apply because there was an error of law made below, and that prior cases of this court, like Naxin, like Google Street View, do not apply because of the changed legal circumstances arising from the 2018 amendments to Rule 23E. In Section 1B of his brief, on page 25, where he makes this argument, he says this is mandated by the plain language of Rule 23E, as amended in 2018. The part that is quoted on that page is a misquote, because he inserts a period at the end of the first of two clauses of the amended text of Rule 23E, and drops the subordinate clause, which puts the context of what the rules committee was concerned about, which is, how do we know that when there are claims to be made on a class settlement, that in fact, those claims were made, and were honored, and class members got paid? And that was the thrust of the reform in 2018. The advisory committee notes make that absolutely clear. That again is unsighted by Mr. Frank, and Mr. Frank has not a single case that indicates that any court has read the 2018 reforms in the way that he did. In fact, in the Google Street View case, where Judge Baby not only wrote the majority opinion, but wrote a special concurrence in which she listed all the concerns arising from the use of cypre, notably, the 2018 reforms to Rule 23E, is not listed as one of them. This is just not an argument that has been credited by any court. And there's a reason for this. Mr. Frank quotes me, so I'm in an odd position here as a witness to myself, but he quotes me from 2007 saying that there's something wrong with the cypre system in the court. And that was my view then, and that continues to be my view, that there was something wrong. And then in 2013, most notably, Chief Justice Roberts says, we have to do something about cypre. We have to address it. In 2018, the Rules Committee did not take that up. Now, the Rules Committee is normally exceedingly attentive to the views of the Chief Justice because, among other things, he appoints the Rules Committee. And the reason they didn't take it up, I would submit to you, is that between 2007, when I said, made those comments, and 2010, when the ALI handed down the principles of aggregate litigation, for which I was the reporter, and my quote referred to the work that was being done by the ALI at the time, when that came down, and then after Chief Justice Roberts' comments, every circuit, in some form or other, adopted the ALI principles of aggregate litigation suggestion. Now, Mr. Berkowitz says that the Ninth Circuit has a stronger test that it adopted in Nixon, the substantial nexus test, the language of the ALI was proximate to the interests of the class. But I think that's a distinction without a difference. I think it's all the same test. It has to further the interests of the class. And Nixon began the process by which this Court assessed whether that had been done. Lane continued that. And Google Refer certainly made that, took up that point. And in Google Refer, Judge Forrest, you asked about this. Judge McEwen took up the exact arguments that Mr. Frank is making here, that there is an obligation, not a permissible outcome, but an obligation to distribute pennies as broadly as you can. And the Court rejected that, rejected that to say there's no foundation for that. At some point, it becomes trivial, it becomes silly. And in fact, the heart of Mr. Frank's argument is that we should structure a system, we as class counsel, and we have, I heard the last argument, we have a fiduciary duty as class counsel, we should structure a system that's premised on the idea that 98% of our class members will get nothing. Were we ever to go into an approval process and say, we have a great system here, it's designed so that 98% of our class members get nothing, Mr. Frank would be crying bloody murder at the opposition to that, because how could we be discharging our responsibility as class counsel? Of course, the comeback to that is, in the settlement that got approved here, 100% of them got nothing. Well, that's not the law of this circuit, Your Honor. I understand that that's the next best option, we'll do Cypre. That is right. I guess I want to ask you what I started with, with your friend across the aisle, in terms of, the district court seemed to think that we can only assess the amount that's going to be paid and the feasibility, more importantly, I think, based on 100% administration of this settlement. And she cites, or sorry, I think it's Davila, cited Lane for that. I see nothing in Lane that speaks to that issue at all, and I'm trying to wrestle with what is the district court saying here? I think he, I think the district court meant to cite Google Refer for that proposition. That's the case from the Ninth Circuit, where Judge McEwen takes up this argument directly and rejects it. And of course, that case is not, that's the case that the Supreme Court vacated, right? It vacated on other grounds, and under, as I understand the rules of this circuit, it continues to have precedential authority as a decision of this court, because it was vacated on other grounds. Or it should have, at least have instructive authority, that that's what that panel, that's what that. I mean, there's a, there's a wide gap between binding authority and instructive authority. I agree. I agree. And I'm not saying. Which do you think it is? I think it's at the very least instructive. I'm not here to argue that it's binding. So, going back to Rule 23E, what it actually was addressed to was the question of when you have a claims process, making sure that the district court maintains oversight over the distribution of the claims process. I want to be careful that I'm not entrenching on Mr. Berkowitz's time. So, in order not to entrench on his time, I'd like to turn to one point that's a little bit different than what we argued in our brief. And that is the court's discomfort with PSI PREA. And I understand that, that that was the thrust of the ALI principles was it's the class's money, give it to them if you can, but be realistic about it. And this is a particular kind of case that I think cries out for PSI PREA. Not that it should be an exception, but that the court should be thinking about what's really in the best interest of the class. Going back to the Cooley torts treatise from 1870, going back to the famous Warren and Brandeis article from 1890, there is a right to be let alone, there's a right to privacy, it is difficult to protect that right. And in 1890, already, Warren and Brandeis were warning that technology was going to expand the scale by which we can invade privacy interests across the country and that the system had to address that. We are now at a scale that's unimaginable. Here we're talking about most of the American population that is affected by this. And in those circumstances, trying to have something meaningful in order to deter improper behavior and perhaps to protect the class. And I would submit to you that much as Mr. Frank does not like the recipients, Judge I was particularly impressed with the MIT proposal, as was I. Because that's a proposal that says we're trying to develop through engineering processes, technologies that will allow individuals to monitor the privacy mechanisms that are potentially being infringed through the application of technology. I would submit to you that that's much more in the interest of the class, which is basically the American population, than is a distribution of a few pennies to a very, very, very small subset of this class. And I don't want to take Mr. Berkowitz's time. Good morning, Your Honors, and may it please the Court, Ben Berkowitz for Google. I'd like to start, Your Honor, with Judge Forrest's question about where is the authority regarding Mr. Frank's argument that funds should or could be distributed to some members of the class. I would point, Your Honors, to page 1114 of Google Street View. There, this Court expressly rejected objectors' argument, represented by the same counsel in this case, that the standard for feasibility asks only whether some members could receive a payment through a claims-based distribution. The Court in Street View considered that question and answered, quote, we disagree. So I think that is law of the circuit. It's also been opined on by courts in other circuits in the same answer, that merely because the parties could have agreed to a settlement in which perhaps 1% of class members would have received a payment and 99% would have received nothing, even though that may be an agreement that different parties may have agreed to, that's not what the Court is evaluating. And that goes to, I believe, the Lane issue that the Court was referencing and that the District Court quoted. In Lane, the circuit held that the question in evaluating the District Court's review of a settlement is not whether the parties agreed to an ideal resolution or an ideal set of SIPRE recipients, but whether one is fair, one that is fair, reasonable, and adequate. I mean, your arguments make sense to me for the most part. And I think Google Street View is different than this case in the sense that feasibility just seems completely unworkable in that case. I don't know how you would identify the class, as we've talked about a little bit already. Here, I don't think that's true. I think that you would be able to find at least some subset of this class. So, boiling it way down to just common sense, the thing that keeps nagging me is, in that situation, when it is feasible to identify some class members, why is it fair to this class to just forego that entirely and say, we think the better thing is to give all this money to public interest organizations, and not even try, not even try to go through the class process. I could see that if the numbers didn't make sense, right? If the administrative costs really would undermine the ability to even pay some subset of class that would show up, but those aren't the numbers here. Here, you've got at least $30 million, even after considering the administrative costs to distribute. So, I think there's two answers to that, both in this court's case law and then on the particular facts of this case. So, with respect to this court's case law, the feasibility question is essentially a two-part disjunctive test. One is, is there enough money to do a pro rata distribution? Here, plainly, the answer to that is no, because you're looking at $0.25 per person before costs and fees of distribution. If, as the district court found, I believe at page 31, the cost of distribution here would likely consume the entirety of the settlement, right? I don't see how those numbers shake out. I mean, based on how it was approved, $42 million is going to go to all the PSI PRE entities. And, as the highest administrative costs, I think we saw, based on the estimates of, I can't remember if it was 3% or 4% of a claim rate, would be $8 million. But that was for, I believe, right, for a tiny percentage of the class. But I think what the court is asking is... But isn't all the evidence in the... I mean, I guess this goes to the question I was asking the other side. What's the evidence in terms of, in cases like this, how many, what percentage of class actually shows up? And everything I've seen is it's a pretty small number. I think that... But I think the point... And I wouldn't dispute that in claims-made settlements, the percentage of classes that quote-unquote show up is typically a small percentage. The question, under this court's case law and street view, is not whether... And under Lane, is not whether an alternative distribution is possible, but whether or not it is practically feasible. And the test for evaluating that under all of the Ninth Circuit precedents has been this question of pro-rata distribution. In Lane, I believe it was something like $1.80 per person. In Easy Sayer Rewards, I believe it was $3 per person. Here, we're looking at $0.25 per person. But isn't that... I mean, in an unliquidated case like this, does it have to be $0.25? I mean, I think I've seen cases where they've sort of set aside a chunk of money for a claims process, went through that process, saw how many claims were actually made, figured out what that pro-rata share should be. And then if there was money left, then you do a SIPRI or something like that. So there's not a windfall, so to speak, to the people who actually make a claim. I mean, it seems like there's other ways to do this that would actually get at serving the goal of making sure that class members get some sort of recovery through an action like this. So I think... I mean, so there's a couple answers to that. Let me give you the case law answer, and then let me give you the answer that's related to the specific facts of this case, which I think also gets to the questions you were asking counsel before in terms of the feasibility of identifying the class. So in terms of the case law, I think Lane, Street View, Refer Header all speak to the fact, as well as Easy Sayer Rewards, all speak to the fact that it's... The fact that it is possible that the parties could have reached a different agreement or an agreement that the court might feel or an objector's counsel might feel is more ideal is not the test. The question is whether, as a whole, we're within the goalposts of the court's case law. And clearly, in terms of fairness, reasonableness, and adequacy, and clearly we are. I mean, this is a de minimis. Under any of the court's cases, 25 cents per person on a pro rata basis is de minimis. But let me answer your question about the feasibility of identifying the class members, because I do think this case is closer to Google Street View than it is to In Re Refer Header. The reason has to do with the class definition, which deals not with collection of information or transmission of information, but with storage of information. No class member... Now remember, this is a class where plaintiffs have alleged Google tracked, among other things, logged out data, anonymized data, de-identified data, pseudonymous data. Class members are simply not going to know, even if they know whether they had the setting turned off, they are not going to know whether Google stored location information about them in some type of anonymized or de-identified way. And this is precisely the issue that came up on the first mission to dismiss in this case, in which the class allegations really related to collection. We pointed out that there are real problems with that. Are you saying that a large percentage of the class was not injured? Is that your suggestion? My suggestion is that there are going to be problems of proof that, like Street View, it is not practically feasible without some large forensic project to have a claims verification process. So it's precisely the same issue in Street View. I thought that Mr. Frank's point was that you just ask people to self-identify and they'll just tell you that they have location services turned off. And then we simply would presume that Google was tracking them without any further obligation to actually prove that. And the court considered this issue in Street. I mean, this was part of the court's analysis in Street View, right? In Street View, the court considers the question, basically says the class members are going to have no way of knowing whether or not Google, in fact, stored information about them without this expensive forensic project. We have the same issue here. I mean, I think the problem in Street View is the class members aren't even going to know that the bad thing even happened. Because who knows how if somebody going by on the sidewalk or on the street or whatever is connecting into your home network? Like, how would you even know that? But you would know if you had your location services on or off, perhaps. I don't know if I do. Well, you would know. I mean, in Street View, obviously the class members would have known whether they had an unencrypted Wi-Fi, right? And they would have known whether they lived in cities where Google was doing this. I think the question there is the same question here. Would they know whether or not location information, or in that case payload data, was actually stored by Google? And that's something that was unknowable in that case, and it's unknowable in this case without some expensive forensic investigation. I have one more practical question, and that is just why does Google care? I mean, the settlement amount is what it is. Why do you care how it gets spent? Well, I think in this case, I mean, I think the parties obviously engaged in a very lengthy settlement negotiation process. So just protection of the effort and the work, which I'm not de-minimizing. I understand that, but that's the interest? No, but what I would say, Your Honor, is that the question in this, I guess I would push back a little bit on the question only in the following sense. The question before this court, and this is talked about, again, in Refer Header, in Lane, in Street View, is an extremely limited one. It's not whether the parties could or should have agreed to a more ideal outcome, either from objectors' counsel's perspective or even from the court's perspective. It's whether or not the deal that the parties struck is fair, reasonable, and adequate. What I'm trying to get at is I understand that's the legal standard. I'm trying to get at is there something different for Google if this goes to site pre-entities versus if this goes through a claims process, at least as a first step to see if there can be a distribution? I would say I think there are real feasibility practical problems from Google's perspective, but I think, again, I don't know that that's part of the standard of review for the court because I think the question is whether as a whole the settlement is fair, reasonable, and adequate. Google's going to be on the hook for what, $62 million? Is that the bottom line figure? They're going to be on the hook for $62 million, whether they give it to the site pre-recipients, whether they give it in 25-cent increments to the class members, or whether they held a lottery and just chose one class member and gave it all to the class member. They're going to be out $62 million. So from Google's perspective, it doesn't really seem to matter except for one thing, and that is that the money that would be used by the site pre-recipients may actually be used to do things that Google might not enjoy or might not approve because it will take away from Google's ability to access things, whereas a 25-cent distribution doesn't seem to go very far. I mean, it is certainly the case that among these site pre-recipients, there are recipients who have sued Google, who have brought cases against Google, and so forth. So I would agree with that summary. All right. Do you have any other questions? Thank you. Thank you, Your Honors. We have some time for rebuttal. Thank you, Your Honor. To answer Judge Forrest's question, where in the record was the claims rate evidence, and that's at 3ER 389 through 390, where we cite several cases, several declarations from other cases from settlement administrators, all of which say you can expect a claims rate well under 2%. Was there any challenge from the other side to the validity of that evidence? They gave counter-anecdotal examples for cases like Facebook BIPA, where the claims rate was 22% because they were making hundreds of dollars available, and there was direct notice, and it was a relatively small class. I guess what I'm getting at is, was there any challenge that the district court couldn't properly consider that information that you presented? The argument was that the district court didn't need to consider that information. And, again, my friend Sam says that the adoption of ALL 3.09 by every court of appeals makes moot any need for the Rules Committee to consider SIPRE. That wasn't what happened at the Rules Committee. There was just a lot of dispute, and they said, let's let it percolate in the court some more. But I think even the premise is wrong because Google Street View expressly rejects 3.09. 3.09 would reject this settlement because the money is going to class council's alma mater's board. The class council sits on the board of one of the largest recipients. There are all sorts of prior representations and interrelationships between class council, defense council, and the recipients that would be impermissible under 3.09, and we're not raising at this stage solely because Street View has already ruled that out. Counsel, let me go back to the question I asked Mr. Berkowitz. It's more of a policy question. Google is going to be on the hook for $62 million. That's coming out of their bank account no matter what we decide here today. The only question is, who do you cut the check to? Do you have to cut a whole bunch of checks for 25 cents? You cut one big check to somebody, we could have a lottery. That would generate a lot of interest among class members and might generate a much, much better return rate, making people aware of what Google had done here. That might be, from some perspective, that might be a better outcome. And there are law review articles suggesting that one reason defendants like Cypress is because then the class never finds out what the allegations are against them. On the other hand, if the ACLU is going to be engaging in litigation or EFF or the Berkman Center is undertaking studies that say, you know, big corporations that access the Internet like Google and Facebook are stealing your privacy, or if MIT is working on technology that will sort of counter what Google did, that feels like that's, you know, maybe more beneficial in the long run. So these are policy questions, not strict legal questions. I'm just trying to figure out— And let me throw in another policy issue, which is that the class action is not a substantive law. It's a procedural device. It's a method of aggregating claims. And you still have attorneys who are representing class members and have fiduciary duties to those class members. So let's take a possible client who everybody agrees is odious. Let's say an attorney is representing Jeffrey Epstein and has access to a pot of Jeffrey Epstein's money and says, you know, this money would be much better for society if I just take it and give it to sexual abuse victims. And I think 100 out of 100 people would agree that, yes, that money is better off going to sexual abuse victims than staying in Jeffrey Epstein's bank account. But if the attorney did that, he'd be criminally prosecuted. He'd be disbarred. You can't take your client's money and say, you know, I think I have a better way to spend it than you do. And all we're saying is that class members should have rights at least equal to Jeffrey Epstein's. So to push this just a little bit now, so do the class representatives have an obligation to all of their class representatives and an obligation to treat them equally? And treating them equally would say, instead of giving you an equal settlement, we're going to I'm going to I'm going to determine I'm going to give it out to all of you who respond. All of you who are paying attention or have time to fill out a form or return the postcard or whatever it is. I think that's absolutely a problem with the underlying class action system as a whole. And that's, I think, the problem with opposing counsel's interpretation of feasibility and Rule 23, because that's every class action. Every class action except maybe one or two a year, maybe four or five a decade, where they just deposit the money in your bank account because the money is big enough that and the defendant is a bank and so they just augment people's bank accounts. But every other one, we settle for a claims process and we necessarily settle for a claims process. And the reality is, it's not worth it for most class members to respond to these things. You get the postcards in the mail. I imagine that even sophisticated consumers like this court get these postcards in the mail and then don't spend the time filling them out. So what's the public interest then in authorizing a settlement when we know that only 3% of class members will ever see anything from it? I think that that's a real existential question for Rule 23 and consumer class actions as a whole. But we've determined that we can aggregate these consumer class actions and you can have claims processes. And it's either good enough for everybody or good enough for nobody. And either they are proposing a rule where the exception for CyPray swallows everything. Every single settlement out there can be turned into CyPray if you adopt the rule. Well, it's just minimalist because if you average out every single class member across what we're being offered to compromise claims that are pretty small to begin with, it's going to be $2 or $3 a class member. That's going to be de minimis. And what's wrong with that? Certainly, would there be a constitutional objection if Congress adopted a CyPray rule? If Congress adopted that rule that instead of having a procedural device to aggregate litigation, we have a substantive cause of action where attorneys can act as private attorneys general and then funnel the money. You know, Brian Fitzpatrick says you get just as much deterrence if you just set the money on fire. And certainly charity would be preferable to that, though, than I think we need to start. To answer my question, would there be a constitutional objection to Congress adopting a CyPray rule? I mean, it's an interesting question whether there's a taking that you're depriving class members of extinguishing rights that they would have otherwise. And the Supreme Court seems to be going the other way, right? They had that recent bankruptcy case. If there would be a constitutional objection to Congress adopting a CyPray rule, wouldn't there be the same constitutional objection to this court adopting a CyPray rule? That's an all-out assault on CyPray, if I read your answer correctly. That may be your position. Maybe that's what you're thinking when you go home at night. But it's an odd answer in this context. We haven't yet contemplated a constitutional challenge because I think just Rule 23 covers it, and basic attorney fiduciary duty to clients covers it. I thought you were saying that such a legislation would be substantive and here the rule is procedural. You're changing the law. Yeah, you'd be changing the law. You're creating this new substantive cause of action that says give the money. And you do have one congressional provision creating CyPray, actually. I think it's in Section 1712, 28 U.S.C. 1712, around there, maybe 13 or 14, but where in coupon settlements you can distribute some of the coupons to nonprofits, but then attorneys can't get attorneys' fees for doing so. Okay, you're over time now, so unless there are any other questions. Thank you, Your Honor. Thank you for your argument. We thank both sides for the argument. The case of Pitaxel and Andren against Gugol is submitted and we're adjourned for this session. All rise. This court for this session stands adjourned.
judges: BYBEE, IKUTA, FORREST